IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 04-81-KAJ |
| | ) | |
| PAUL J. LEARY, JR., and TRAVIS E. LEARY, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Colm F. Connolly, United States Attorney, District of Delaware; Keith M. Rosen, Assistant United States Attorney, District of Delaware; Ferris W. Wharton, Assistant United States Attorney, District of Delaware; The Nemours Building, 1007 Orange Street, Suite 700, P.O. Box 2046, Wilmington, Delaware 19899-2046, Counsel for Plaintiff.

Charles M. Oberly, III, Esquire; Oberly, Jennings & Rhodunda, P.A., 800 Delaware Avenue, Suite 901, P.O. Box 2054, Wilmington, Delaware 19899-2054, Counsel for Defendant Paul J. Leary, Jr.

Edmund D. Lyons, Jr., Esquire; The Lyons Law Firm, 1526 Gilpin Avenue, P.O. Box 579, Wilmington, Delaware 19899-0579, Counsel for Defendant Travis E. Leary.

July 15, 2005
Wilmington, Delaware



Jordan, District Judge

## I. Introduction

Before me in this criminal case are the defendants' post-conviction motions "seeking a new trial on the basis of newly discovered evidence, the interest of justice, and for judgment of acquittal pursuant to Rules 33 and 29 of the Federal Rules of Criminal Procedure[.]" (collectively, Docket Item ["D.I."] 116; the "Motions".)[1] Having reviewed the motions and the parties' submissions in support and in opposition to them, I have determined that the Motions must be denied.

## II. Background[2]

On the evening of October 27, 2002, a restaurant and bar known as the "Yankee," located in Glasgow, Delaware, was burned beyond repair in a fire that was plainly a case of arson. The building in which the Yankee operated was owned and managed by a development company that also owned the rest of the shopping center in which the restaurant was located. The business of the Yankee, however, belonged to

---

[1] Defendant Travis Leary had earlier filed a separate motion pursuant to Federal Rule of Criminal Procedure 33, seeking a new trial on the theory that the jury's verdict is "against the great weight of the evidence." (D.I. 93 at 1.) That motion expressly requested leave to "submit a supplementation" at a later date. (*Id.* at 2.) No further briefing on that motion was submitted but, pursuant to a stipulation among the parties (D.I. 110), additional time was granted for the filing of post-trial motions. The motions noted above were filed in accordance with that stipulation. The earlier motion filed by Travis Leary is thus superceded by the motions now under consideration.

[2] This background information is drawn from the trial record in general and is not an attempt to represent facts found by the jury, nor does it constitute findings of fact by the court.

two young entrepreneurs, Paul Leary, Jr., and his brother Travis.[3]  The Leary brothers had successfully operated a sandwich shop together and, in acquiring the Yankee, they were determined to step to a higher level of business risk and reward.  They purchased the business for $150,000 from a partnership that was, like the Learys, also essentially a family business, two of the partners being relatives named Ozdemir.[4]  The Learys then poured significant time and effort into preparing the restaurant to reopen under their management.  Their parents and Paul's wife also invested sweat equity in the enterprise.  When the Learys opened the restaurant as their own in August of 2002, it was a proud and happy day for the entire family.

Storm clouds appeared quickly, however.  The Ozdemirs had taken half of the purchase price in the form of a note.  The Learys believed that, because of problems they discovered at the Yankee after the purchase, they were entitled to offset their obligations on the note by the sums they had paid to rectify those problems.  They thus found themselves at odds with the former owners almost immediately.  Further complicating matters, the Learys had failed to obtain a liquor license and were serving alcohol illegally.  They were purchasing their liquor supplies under a license that had been issued to someone who had owned the Yankee before the Ozdemirs.  Quite rightly, the Learys believed that it was in their interest to obtain the necessary license,

---

[3]Although the ownership structure of the restaurant was not the subject of detailed testimony, the Learys' father, Paul Leary, Sr., also may have had an ownership interest in the Yankee.  With no intention to be unduly familiar, I will at times, for ease of reference, identify the Leary brothers solely by their first names.

[4]Again for ease reference, the former owners will be referred to collectively as the Ozdemirs.

and they hired an attorney to help them with that process. They apparently took some comfort from their belief that their agreement with the Ozdemirs allowed the business acquisition to be rescinded if a proper liquor license could not be obtained.

The Learys worked long hours virtually every day at the restaurant. Paul managed the purchase and preparation of food and drinks, while Travis managed the waitstaff and dealt with the customers. They were not able to draw a regular salary but occasionally took a draw from the operating income of the business. The business also paid for their health insurance.

Insurance on the business itself became a particular point of discussion soon after the Learys began operating the Yankee. In mid-October of 2002, Paul called the insurance agent who had assisted them with acquiring property and casualty insurance prior to their re-opening the restaurant. After consultation with Travis, Paul directed the agent to increase the insurance on the business, which included coverage for losses caused by fire. For a modest increase in premiums, coverage was increased from $100,000 for restaurant equipment and $100,000 for business personal property to $200,000 for restaurant equipment and $125,000 for business personal property, or a total increase of $125,000 in coverage beyond the levels which had initially been set. The business also carried business interruption insurance. The agent, who had years of experience and had been to the restaurant site, agreed that the levels of coverage carried for the Yankee were reasonable, even after the mid-October increases.

Approximately one week before Paul told the agent to bind the new coverage limits, Travis Leary had a noteworthy discussion with a representative of the landlord of the premises in which the Yankee operated. The landlord was not aware that the

Yankee's business had been sold. From the landlord's perspective, the Learys were new partners in the existing business. They had not taken over the lease but had merely been added to it, while the Ozdemirs remained obligated on the lease. On October 7, 2002, Travis called and asked the landlord's representative about who insured the Yankee and what the coverages were. After asking about damage caused by war or by earthquake, he asked several questions about insurance coverage for fire damage and was told that the landlord carried insurance on the building but that the operators of the restaurant needed their own insurance on the contents of the building. The landlord's representative made particular note of the conversation because it struck her as odd that Travis had so many questions about fires and fire insurance, and because Travis ended the conversation by emphasizing that the restaurant premises were old. In over thirty years of working with the landlord, she had never had a conversation like it, and it prompted her to immediately comment on it to her co-workers and to memorialize it in an office file.

On Sunday, October 27, 2002, Travis went with the young woman he was then dating, Danielle Donovan, to a store in Newark, Delaware and purchased a package of candle wicks. That night, the inside of the Yankee was doused in various spots with gasoline and set afire. The arsonist or arsonists also attempted to set fire to gas cans by soaking rags with gasoline and trailing them from the spouts of the cans.[5] In one instance at least, that homemade fuse was augmented by a length of candle wick.

---

[5] The contents of the gas cans did not ignite or explode because, it seems, the fuel mixture was too rich, the arsonist having filled the cans too full of fuel.

There were no apparent signs of forced entry to the restaurant,[6] and members of the Leary family had the only keys to the premises.

Following the fire, the Learys, though they had operated the Yankee for only three months at a roughly break-even rate of business, filed an insurance claim for more than $700,000 in losses. Investigators for the insurance company and law enforcement agencies concluded that the Leary brothers had conspired with one another to set the fire. On August 12, 2004, the Learys were indicted for conspiracy, arson, and mail fraud.[7] (D.I. 2.) The case was tried to a jury for two weeks, from April 6 to April 20, 2005. The Learys presented an alibi defense,[8] claiming that they left the restaurant together shortly before 10:00 p.m. and went to Travis's home, where they counted money for deposit in the bank. On April 21, 2005, the jury returned a verdict of guilty on all counts against both defendants. (D.I. 84.)

Paul Leary now moves for a new trial under Federal Rule of Criminal Procedure 33, based on newly discovered evidence, namely evidence that Danielle Donovan gave "false testimony on a material issue going to the heart of the Government's case." (D.I. 116 at 6-7.) Both defendants move under Rule 33 for a new trial based on their allegation that the Government withheld exculpatory evidence. (D.I. 116 at 7.) Both

---

[6] There was, however, a hole of relatively small size in one of the windows.

[7] The conspiracy charges were brought pursuant to 18 U.S.C. §§ 371 and 844(n). The arson charges were brought pursuant to 18 U.S.C. §§ 2 and 844(i). The mail fraud charges were brought pursuant to 18 U.S.C. §§ 2 and 1341.

[8] Travis testified, but Paul did not. Nevertheless, both defendants relied on the alibi asserted in Travis's testimony. (See, e.g., 4/19/05 Tr. at 233.) The defendants also relied on other witnesses, through direct and cross examination, in their effort to establish a time line of events consistent with their alibi.

defendants also move for a new trial based on a variety of allegations amounting to the assertion that a new trial is required in the interest of justice. (*See id.*) Finally, Paul Leary moves under Rule 29 for a judgment of acquittal "because based upon the evidence presented no rational trier of fact could have found him guilty beyond a reasonable doubt." (*Id.*)

### III. Standards of Review

A. *Motions for New Trial*

Both defendants seek a new trial pursuant to Federal Rule of Criminal Procedure 33. (D.I. 116 at 1-25.)[9] Motions for a new trial are evaluated by different tests, depending on the argument being advanced.

1. Newly Discovered Evidence

Rule 33 allows for a new trial if there is newly discovered evidence and if "five essential requisites" are met:

> 1. The evidence must have been discovered after the trial;
> 2. The failure to learn of the evidence must not have been caused by defendant's lack of diligence;
> 3. The new evidence must not be merely cumulative or impeaching;
> 4. It must be material to the principal issues involved; and
> 5. It must be of such a nature that in a new trial it would probably produce an acquittal.

*United States v. Meyers*, 484 F.2d 113, 116 (3d Cir. 1973). This test is commonly referred to as the "Berry" test, *id.*, after the nineteenth century case in which it originated. *See* 3 Wright & Miller, Fed. Prac. & Proc. Crim. (3d ed.) § 557 n.4 (citing

---

[9]One of the arguments advanced under the "newly discovered evidence" heading is by Paul Leary alone, as is described in more detail herein (*see infra* at Sec. IV.A.1).

6

*Berry v. State*, 1851, 10 Ga. 511, 527, as the source of the test).[10]

When the newly discovered evidence involves exculpatory evidence that the Government had in its possession, the rule in *Brady v. Maryland*, 373 U.S. 83 (1963) is implicated and the standard for obtaining a new trial is somewhat relaxed.[11]  Generally speaking,

---

[10] Paul Leary contends that, for cases involving perjury, the United States Court of Appeals for the Third Circuit has adopted a test that originated in the Seventh Circuit's decision in *Larrison v. United States*, 24 F.2d 82 (7th Cir. 1928). (*See* D.I. 116 at 1-3; D.I. 146 at 1-3.)  The so-called *Larrison* rule calls for a new trial when "(a) The court is reasonably well satisfied that the testimony given by a material witness is false. (b) That without it the jury *might* have reached a different conclusion. (c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial." *Id.* at 87-88 (emphasis added).  The Government correctly counters (D.I. 142 at 3-4) that the Third Circuit has never adopted the *Larrison* rule. *See Government of Virgin Islands v. Lima*, 774 F.2d 1245, 1251 n.4 (3d Cir. 1985) ("The *Larrison* test has not been adopted by this Court ... ."), and that even the Seventh Circuit has recently abandoned it, *see United States v. Mitrione*, 357 F.3d 712, 718 (7th Cir. 2004) ("This old test puts our circuit at odds with other circuits which, absent a finding that the government knowingly sponsored the false testimony, require a defendant seeking a new trial to show that the jury would *probably* have reached a different verdict had the perjury not occurred. ... Today, we overrule *Larrison* and adopt the reasonable probability test.").  The only Third Circuit case cited by the defendants as applying the *Larrison* rule is *United States v. Massac*, 867 F.2d 174 (3d Cir. 1989).  In that case, however, the Court stated that its earlier precedent "did not flatly adopt the *Larrison* rule[,]" *id.* at 178, and the Court apparently applied the rule only because the parties before the district court had agreed to have the case decided under that rule. *See id.* ("the district court stated in its Memorandum Opinion ... that the parties agreed that the so-called *Larrison* rule should be applied").  The proper test, in short, is not a "might have" test; it is the test prescribed by the *Berry* rule.  *Cf. United States v. Stofsky*, 527 F.2d 237, 245-46 (2d Cir. 1975) (describing reasons for rejecting *Larrison* rule).

[11] "*Brady* requires that the prosecution turn over evidence which is favorable and material to the defense." *United States v. Joseph*, 996 F.2d 36, 39 (3d Cir. 1993); *see also United States v. Josleyn*, 206 F.3d 144, 151 (1st Cir. 2000) (*Brady* "requires the government to produce to defendants exculpatory and impeachment evidence that is in its custody, possession, and control ... .").

> [f]or Rule 33 motions [based on newly discovered evidence], the evidence must create an *actual probability* that an acquittal would have resulted if the evidence had been available. If, on the other hand, the government possesses *Brady* evidence but does not disclose it, ... the non-disclosure warrants a new trial if the evidence is "material." It is "material" only if there is a "reasonable probability" that the evidence would have changed the result.

*United States v. Josleyn*, 206 F.3d 144, 151 (1st Cir. 2000) (emphasis in original; internal quotation marks and citations omitted); *cf. United States v. Agurs*, 427 U.S. 97, 112 (1976) (conviction must be set aside if withheld *Brady* material "creates a reasonable doubt that did not otherwise exist").[12]

### 2. Interest of Justice

Rule 33 also provides that a new trial may be ordered for reasons besides newly discovered evidence, "if the interest of justice so requires." Such arguments are often couched in terms of the weight of the evidence.[13] The process for evaluating them calls

---

[12] The Supreme Court has described three categories of cases in which the *Brady* rule applies. "In the first situation, ... the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury." *Agurs*, 427 U.S. at 103. In such a case, the conviction "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* "The second situation ... is characterized by a pretrial request for specific evidence." *Id.* at 104. If a sufficiently specific request is made and the requested material is not delivered to the defense, then a new trial is warranted, if "the suppressed evidence might have affected the outcome of the trial." *See id.* Finally, in the third category of cases, in which either no request for information is made or only a general request is made, a conviction must be set aside "if the omitted evidence creates a reasonable doubt that did not otherwise exist ... ." *See id.* at 112. In the case at bar, neither the first nor the second circumstances are presented.

[13] The argument is distinct from the assertion that the evidence is insufficient to sustain the verdict, which would lead to acquittal under Federal Rule of Criminal Procedure 29. In discussing their "interest of justice" arguments for a new trial, the defendants acknowledge that their position is in essence that the verdict is contrary to the weight of the evidence. (*See* D.I. 116 at 4-5 (under heading "New Trial – Interest of

8

for the court to "not view the evidence favorably to the Government, but instead [to] exercise[] its own judgment in assessing the Government's case." *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir.), *cert. denied*, 540 U.S. 898 (2003). Motions for a new trial in the interest of justice are committed to the sound discretion of the district court, *id.*, but the standard for reviewing them is extraordinarily high. "A district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred - that is, that an innocent person has been convicted." *Brennan*, 326 F.3d 176, 189 (citation and internal quotation marks omitted). Thus, "[m]otions for a new trial based on the weight of the evidence are not favored. Such motions are to be granted sparingly and only in exceptional cases." *Government of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987) (citations omitted).

B. *Motion for Judgment of Acquittal*

Paul Leary moves in his own right for a judgment of acquittal pursuant to Federal Rule of Civil Procedure 29, arguing that the evidence adduced at trial is insufficient to sustain the verdict against him. (D.I. 116 at 6, 44-45.)

> In ruling on a motion for judgment of acquittal ..., a district court must review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence. A finding of insufficiency should be confined to cases where the prosecution's failure is clear. Courts must be ever vigilant in the context of Fed.R.Crim.P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury.

---

Justice," the defendants point to "the test used when evaluating a request for a new trial based upon a claim that the verdict is against the weight of the evidence").)

*United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (internal quotation marks and citations omitted).

## IV. Discussion

I address the motions and arguments in the same order in which they were presented by the defendants.

### A. *Motions for New Trial*

#### 1. New Evidence – The Travis Leary and Ms. Donovan Affair

Paul Leary argues that he is "entitled to a new trial as a result of newly discovered evidence that Government witness Danielle Donovan gave false testimony on a material issue going to the heart of the Government's case, which testimony, if omitted, might have resulted in a different verdict." (D.I. 116 at 6-7.) The evidence he points to, however, does not go to the heart of the case and, importantly, it makes no legal difference if its introduction "might" have caused a different outcome in the case. As noted (*supra* at Sec. III.A.1. & n.10), the controlling *Berry* test sets forth five factors, all of which must be met in order for a new trial to be granted under Rule 33. Paul's "new evidence" motion fails to meet three of the five factors and therefore must be denied.

The new evidence includes a series of e-mails between Ms. Dononvan and Travis Leary that indicate the two had a continuing sexual relationship that lasted until sometime in the Fall of 2004, after both had married other people and long after the time that the jury was led to believe the relationship had ended. (*See* 4/11/05 Tr. at 109